UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
THOMAS SWARTZ,                          )
                                        )
            Plaintiff,                  )          Civil Action No.
                                        )          18-12577-FDS
      v.                                )
                                        )
NORMAN SYLVESTER, in his individual     )
capacity, and TOWN OF BOURNE,           )
                                        )
            Defendants.                 )
_____)


MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

SAYLOR, C.J.

       This is an action under 42 U.S.C. § 1983 for an alleged violation of the right to free

exercise of religion.  Defendant Norman Sylvester, the Fire Chief of the Bourne Fire Department

("BFD"), ordered plaintiff Thomas Swartz, a firefighter, to sit for a photograph in May 2016.

Swartz refused to do so, allegedly on the basis of his sincerely held religious beliefs.  As a result,

he was suspended for 24 hours without pay, among other disciplinary measures.

       Count One of the complaint alleges that the order and the resulting discipline violated

Swartz's rights under the Free Exercise Clause of the First Amendment.  Count Two, which is

largely unrelated, arises under Mass. Gen. Laws ch. 149, § 148.  In August 2018, Swartz was

terminated from the BFD.  He alleges that defendants Sylvester and the Town of Bourne failed to

pay him for certain unused time he had accrued at the time of his termination, and that their

failure to pay violated ch. 149, § 148.

       Defendants have moved for summary judgment.  As to Count One, they contend that (1)

the evidence is insufficient to prove a deprivation of rights secured to Swartz by the First

Amendment and (2) in any event, Sylvester is entitled to qualified immunity.  As to Count Two, they contend that Swartz had no oral or written agreement with BFD that it would pay him for the time in question upon his termination, and that such an agreement is required for him to recover under Mass. Gen. Laws ch. 149, § 148.

For the reasons stated below, defendants' motion for summary judgment will be granted as to Count One, and the Court will decline to exercise supplemental jurisdiction over the claim in Count Two.

## I.      Background

### A.      Factual Background

The following facts are undisputed except as otherwise noted.

#### 1.      Parties

Thomas Swartz is a retired firefighter.  (Def. Reply to Pl. SMF ¶ 48).  He worked for the BFD from July 1997 until August 2018.  (Defs. Ex. N ("Swartz Dep.") at 32-34).

Norman Sylvester is the Fire Chief of the BFD.  (Defs. Ex. B ("Sylvester Dep.") at 28-29).  He was appointed Fire Chief in February 2015.  (*Id.*).

The Town of Bourne is an incorporated municipality in Massachusetts.  (Am. Compl. ¶ 4).

#### 2.      Sylvester's Decision to Take Photographs of Fire Employees in Class A Uniforms

According to Sylvester, "right around 2016," he decided that the identification cards and personnel accountability tags ("PATs") of all BFD employees should contain a photograph of the employee in a class A uniform.  (Sylvester Dep. at 40, 48, 49).  ID cards are primarily used as a way for firefighters to gain access to a fire scene even if they are arriving off-duty and not in uniform.  (*Id.* at 50-51).  PATs are collected at a fire scene to track who is there and to make sure

that everyone is accounted for at the end of a job.  (*Id.* at 65-66).  Class A uniforms are formal uniforms that firefighters typically wear for events such as wakes, funerals, and some court appearances.  (*Id.* at 73-74; Pl. Ex. 1 ("Photo of Swartz in Class A Uniform")).

Sylvester testified that he made the decision because there was no "consistency" in the photographs on the ID cards and PATs—that is, "some people were in t-shirts, some people were in ties, other ones were in college shirts."  (Sylvester Dep. at 48).  He testified that he wanted "to make them look more professional, streamlining, continuity so everybody pretty much looked the same," and to "ha[ve] a professional department."  (*Id.* at 78, 49-50).  He further testified that he was also planning to hang up the photographs in the main lobby area of the station on a bulletin board to display to members of the public.  (*Id.* at 150; *see also* Pl. Reply to Defs. SMF ¶ 30).  According to Sylvester, the bulletin board would be a way to allow the public to identify BFD employees who did a good job or a bad job at a fire scene.  (Sylvester Dep. at 151-52).  When asked whether it was "for [] public relations purposes," he responded that he "wouldn't call it that," and that "[it was] more like a static display so [that the public] know[s] who works [for the BFD]."  (*Id.* at 151).  He also testified that the names of the firefighters in the photographs would not be posted on the bulletin board.  (*Id.* at 151-52).

Richard Emberg, a lieutenant in the BFD, testified that Sylvester told him that he wanted the photos "for [a] wall . . . and for someone who does something good," and so that if a firefighter were to pass away in the line of duty, they could "submit [the] photograph to the media" and "for respect purposes."  (Defs. Ex. C ("Emberg Dep.") at 14, 35).  Paul Weeks, a BFD deputy chief, never spoke to Sylvester about why he wanted the photographs, but testified that his understanding, "perhaps [from] Lieutenant Emberg," was that "it was a tradition in the department that [Sylvester] came from that people would have their Class A photos taken, and

[that] they would be available for the public view in the office . . . [and] he wanted to bring [that tradition] to the Bourne Fire Department." (Defs. Ex. H ("Weeks Dep.") at 18, 99-100). He also testified that his understanding was that the photographs were going to be taken in case "an event happened and he needed it for the media" or there was a "promotion." (*Id.* at 35).

Bourne is part of the Barnstable County Fire Chiefs Association, which has set standards for PATs.[1] The standards require PATs to have, at a minimum, the employee's name, department identification number, and rank/medical rating. (Defs. Ex. J ("BCFCA Accountability Overview") at 5; Sylvester Dep. at 63, 66). In addition, "[a] [c]urrent picture is highly recommended." (BCFCA Accountability Overview at 5; Sylvester Dep. at 66).[2] Weeks testified that he was "not aware of any department policy regarding photographs of department members" but that "he [did know] that [fire employees] all had to get [their] IDs taken" and that it "had a photo on it." (Weeks Dep. at 25). Emberg likewise testified that he was "[not] aware of any department policies regarding photographs of department members." (Emberg Dep. at 19).

### 3.     The Implementation Process

Emberg testified that Sylvester asked him to organize when and where the photographs of employees in class A uniforms would be taken. He also testified that he understood "it to be mandatory to have [the] photos taken" and his job to be "to get all members [of the BFD] to have their Class A photos taken." (Emberg Dep. at 35-37). He broke the employees into "four shifts"

---

[1] It is unclear from the record whether these are also the standards for ID cards.

[2] Sylvester also testified that when firefighters retire, they are given a copy of their ID card, and he keeps a copy of their ID in their personnel folder. (Sylvester Dep. at 59-60). He testified that his idea to take the class A photographs arose in part because he had "looked at trying to make [retirees] ID cards, but [their pictures were] from 30 years ago" and so "[he couldn't] use that for an ID." (Sylvester Dep. at 78; *see also* Pl. SMF ¶ 18 ("[Sylvester] also wanted [the photographs] to be able to provide identification cards to retirees.")).

and arranged "certain dates for certain shifts" when the photographer would come in to take the photographs.  (Emberg Dep. at 38-39).

On January 30, 2016, Joseph Carrara, a BFD deputy chief, sent an e-mail to all fire department employees stating as follows:  "Emberg has been working to arrange professional photos for all department members.  He is now attempting to compile a list of everyone in regards to Class A uniforms . . . .  Upon returning to work, please advise your Deputy if you have a class A or not and if so if you are missing anything i.e. badges, etc."  (Pl. Ex. 9 ("January 30 e-mail")).

On March 11, 2016, Emberg e-mailed all fire department employees.  The e-mail said that in the next few weeks, "all members [would] be getting a department photo taken by the department photographer" and that "[a] Class A uniform [would] be required for this photo to be taken."  (Defs. Ex. D ("March 11 e-mail"); *see also* Emberg Dep. at 62 (testifying that he sent the communication by e-mail)).  Emberg testified that he "considered [the e-mail] . . . an order" and "consider[ed] it to be mandatory that the firefighters would have to show up for their Class A photograph based upon [the March 11 e-mail]."  (Emberg Dep. at 62).

On April 11, 2016, Emberg sent another e-mail to all fire department employees.  It stated that "for [those] who already had [class A photos], [they] must be retaken again on these dates."  (Defs. Ex. E ("Apr. 11 e-mail")).  Emberg testified that he also considered the April 11 e-mail "mandatory" and "an order."  (Emberg Dep. at 62).

Emberg sent another e-mail about the photos on May 1, 2016.  It appears from the header to be addressed only to Sylvester; it is unclear whether the same or a similar e-mail was sent to

other fire department employees.  (Defs. Ex. F ("May 1 e-mail")).[3]  It stated that the photos

would be the next day at noon, and requested that "[a]ny members not able to make the[ir] shift

Class A photo [to] please try to make one of the next three schedule dates."  (*Id.*).

On May 2, 2016, Weeks told lieutenants and firefighters under his command, which

included Swartz, that they would have their photos taken that day.  (Weeks Dep. at 39-41, 53).

Weeks testified that "to be honest [he] wouldn't describe [that communication] as an order," and

that "[there] was an understanding that everyone was to have their photo taken," but that "he

[didn't] know that [he] could describe it as an order like [he] would on the fire ground."  (*Id.* at

52).  He further testified that the orders "[he] ha[s] to give [] at a fire scene, [] those can't be

questioned" and "need to be followed provided people are safe . . . [but that [he] fe[lt] that was –

the photos coming from me, it wasn't an order from me.  It was what the chief wanted people to

do."  (*Id.* at 53).  In addition, he testified that "it wasn't [his] understanding that it was going to

be a requirement for everyone until . . . Swartz [refused]," but also that he "did not" have "an

understanding [on May 2, when he told his reports that their photographs would be taken that

day] whether or not the photographs would be required."  (*Id.* at 101-02).

### 4.    Swartz's Refusal to Be Photographed

On the morning of May 2, Swartz told Weeks that he did not intend to have his photo

taken.  Weeks does not recall his exact words, just that "[Swartz] did not want to have it taken[,]

[] [which] caught the attention of [Sylvester]" whose office was next to his.  (Weeks Dep. at 40-

41).

Swartz asked Sylvester to speak to him in private, and they went into Sylvester's office

---

[3] Sylvester testified that he did not know if the e-mail went to anyone else in the department.  (Sylvester
Dep. at 94-95).  Emberg does not appear to have been asked at his deposition about the e-mail.

and closed the door.  (Sylvester Dep. at 96).  Sylvester testified that he asked Swartz "why he [wasn't] taking the photo" and that Swartz told him "it was because of his religious beliefs." (*Id.*).  When asked if he recalled anything else Swartz said, he answered:  "His religious beliefs about – I didn't understand the self promotion maybe[,] [but] I don't want to say the wrong word."  (*Id.*).  He testified that he "[couldn't] be sure" what else Swartz said, but that "[he] [] told him point blank, go put it in writing."  (*Id.*).  According to Sylvester, while he was "on the way out" he asked him "[if] he had a driver's license" and he said "yes."  (*Id.* at 99-100).[4] Sylvester testified that he asked him "how [] he t[oo]k a photograph for that," but that he could not recall if Swartz responded.  (*Id.* at 99).  He further testified that "[he] was – legitimately [] taken aback by the religious beliefs" and that it was the "first [he'd] ever heard of this, all [his] years of being a firefighter, lieutenant, fire chief"—that is, "a firefighter saying[] he couldn't take a photograph."  (*Id.* at 97-98).

Swartz testified that during that conversation he asked Sylvester "[if] the class A photos [] were going to be—if there was something going on with some identification tags or some department identification or incident command or safety."  (Swartz Dep. at 138).  He testified that Sylvester responded:  "What if you get promoted and I want to send a picture of you to the newspaper?"  (*Id.*).  According to Swartz, he told Sylvester that "it was against [his] religious beliefs to have this Class A photo for self—for promotional purposes, and [he] asked him if it would be okay with him if . . . [he] sent him an email following up on that."  (*Id.* at 139).

That same day, at 1:26 p.m., Swartz sent the following e-mail to Sylvester:  "In response to your request for my participation in portrait photography for use other than accountability, I

---

[4] In addition, he testified "I'm going to assume, yes" that "Swartz had a department ID in May[] 2016," because he also assumed that "all department members had IDs with photographs on them" at that time.  (Sylvester Dep. at 103).

request not to participate.  Portrait photography for personal recognition goes against my

religious beliefs."  (Defs. Ex. I ("May 2 e-mails")).  Sylvester sent the following response at 4:45

p.m.:

> [Y]our request is respectfully denied for the following reasons:
>
> 1. These photos are in fact for use by the Bourne Fire Department as a
> form of accountability and Department identification as a member of the Town of
> Bourne Fire Department.
>
> 2. Your participation is a requirement as an order from the Town of
> Bourne Fire Chief.  The next available time for Class A photos will be Friday
> May 6, 2016, and Monday May 9, 2016.  Whereas you did not participate during
> the time allotted on duty, you will not be compensated for your time.  Failure to
> follow this order will result in disciplinary action.

(*Id.*).

On May 5, 2016, Emberg sent the following e-mail to Sylvester:  "May 6th and 9th will

be the last two days to get a Class A photo.  The chief has mandated these photos.  If you have

not made it to your assigned shift photo[,] [i]t is your responsibility to make it to one of the next

two scheduled dates."  (Defs. Ex. G ("May 5 e-mail")).  The parties agree that the same e-mail

was sent to all fire department employees.  (*See, e.g.*, Pl. SMF ¶ 28 ("On May 5 Emberg

communicated to the department that the Chief had mandated Class A photographs.  Emberg to

Sylvester E-mail, May 5, 2016 8:30 p.m., attached as Exhibit 17.  Prior to [that] . . . the

photographs were not mandatory.") (citations omitted); Pl. Opp. at 5 ("On May 5 Sylvester

mandated Class A photographs for all department members."); Pl. Opp. at 10 ("Critically,

Sylvester originally issued the directive to Swartz personally, and only after three days issued it

Department-wide. [SOF] ¶28.")).

Swartz did not sit for a photograph on either May 6 or May 9, 2016.  (Weeks Dep. at 102-

03; Sylvester Dep. at 181; Pl. Reply to Defs. SMF ¶ 38).

5.      **Discipline of Swartz**

On May 13, 2016, Weeks sent the following e-mail to Sylvester, among others:

At 7:00 a.m. this morning, a disciplinary meeting was held regarding the failure of Firefighter Thomas Swartz to follow a direct order of the Bourne Fire Chief. The order was for  FF Swartz  to report for Class A photos as required for all members of the Bourne Fire Department.  FF Swartz refused to have his photo taken on May 2, 2016 (while on duty) and was ordered to submit in writing his failure to do so.  His response was unsatisfactory to the Fire Chief, and he was then ordered to report for the [p]hotos on the remaining dates offered.  He again refused to do so.

Per order of Chief Sylvester, FF Swartz was placed on administrative leave at 18:00 on 5/10/2016 for the Night Shift, and again on 5/12/2016 for the Day Shift.

(Defs. Ex. K ("May 13 e-mail")).

That same day, Sylvester sent Swartz a letter explaining that in response to "the incident of insubordination [] on May 2, 2016," he would be suspended for 24 hours without pay— already served on May 10 and May 12, 2016—and was ineligible for out-of-grade opportunities (which result in higher pay) for six months.  (Defs. Ex. L ("Sylvester disciplinary letter"); May 13 e-mail; Pl. SMF ¶ 31; Pl. Opp. at 5 (explaining that the time was served on May 10 and 12)).[5]

As of May 13, four other employees had not sat for their class A photographs.  (Defs. Ex. P ("May 13 e-mail")).  Those employees were on vacation or off-duty when the photographer came in to take the photos.  (Sylvester Dep. at 126).[6]  Sylvester distinguished the treatment of those employees because they "never expressed to [him] . . . that they declined to sit for the photograph," (*id.* at 180), and in addition, because Swartz "refused to [take the photo while] on

---

[5] A disciplinary policy of the BFD that was effective as of October 25, 2017, provided that suspensions of five days or less were warranted in the case of repeated infractions or major offenses.  (Pl. Ex. 20 ("Disciplinary Policy") at 1).  However, it is unclear whether that policy was in place at the time of Swartz's suspension.  Sylvester testified that he could not be sure whether it was and that "[they] were in transition of doing all our rules and regs and policies that first year [when he was appointed chief], 18 months, [or] two years . . . ."  (Sylvester Dep. at 140).

[6] Sylvester made separate arrangements to take the photographs of employees on vacation.  (Sylvester Dep. at 126).

duty." (*Id.* at 126).  Those four employees eventually had their class A photographs taken.  (*Id.*; Pl. Reply to Def. SMF ¶ 45).

At some point, Swartz also sat for a photograph in his class A uniform, and it was displayed on the public bulletin board for some period of time.  (Weeks Dep. at 32; Sylvester Dep. at 104; Photo of Swartz in Class A Uniform).[7]

Sylvester testified that when Swartz was disciplined, he "[already] knew with some certainty that [Swartz] either had just had a photo taken or would soon be having his class A photo taken" because "[they] had the photographer coming back [] for [a] final time."  (Sylvester Dep. at 110).  No additional scheduling effort was required to take Swartz's photograph.  (Emberg Dep. at 45-46; Defs. Reply to Pl. SMF ¶ 33).[8]

Sylvester testified that he was familiar with the First Amendment because he "heard of [it] back in high school" and that he knows that it protects "freedom of religion, [but that] other than that, [he's] not a lawyer."  (Sylvester Dep. at 168-69).  He also testified that "he [didn't] know of any laws" that govern the practice of religion at work.  (*Id.* at 168).  However, he testified that he knew that "he [could] not force an employee to participate in prayer at work" and that he "assume[d]" that "he [couldn't] punish employees for practicing their religion at work . . . if that's what they believe."  (*Id.* at 169-70).

### 6.    Swartz's Claimed Religious Beliefs as to Photographs

Swartz testified that he "practice[es] Christianity" and "attend[s] mass" at a Catholic

---

[7] The uniform was apparently missing a hat badge, and his facial features are partially obscured due to his hat.  (Photo of Swartz in Class A Uniform; Sylvester Dep. at 104).

[8] As of July 30, 2016, Emberg was still making arrangements for firefighters to take photographs in their Class A uniforms.  (Pl. Ex. 22 ("July 30 e-mail") (describing a "Class A photo make[-]up date" scheduled for August 15); Defs. Reply to Pl. SMF ¶ 37).  It is unclear from the record whether Swartz had already had his photograph taken by then.

church every Sunday when not on duty, and on Saturday afternoons if he is on duty on Sundays. (Swartz Dep. at 114, 116).  He is baptized and was confirmed as a Catholic.  (*Id.* at 115).  He attested that his "personal religious beliefs prevent [him] from participating in personal self-promotion for aesthetic purposes.  Self-promotion for personal recognition violates how [he] believe[s] God wants [him] to communicate and express [himself]."  (Pl. Ex. 7 ("Pl. Supp. Answers & Objs. to First Interrogs.") at 4).

Although he testified that "[he] [was not] aware of a particular scripture verse that supports [his] idea that [he] can't have portrait photography taken for self-promotion purposes," he testified that his belief derives from the First Commandment.  (Swartz Dep. at 113, 115-16); BRITANNICA, https://www.britannica.com/topic/Ten-Commandments ("You shall have no other gods before me.") (visited on June 17, 2021).  He further testified that he has "[n]ever read any [] religious literature from the Catholic Church that prohibits portrait photography for personal recognition" and has "[never] heard a Catholic priest, bishop, cardinal, [or] any member of the clergy [] state verbally that portrait photography for personal recognition is objectionable."  (*Id.* at 117-18).  When asked what his understanding of the First Commandment is, he testified, "I'm not going to qualify to you or to anyone else, I don't feel the need to qualify what my understanding of the First Commandment is.  I have a relationship."  (*Id.* at 113-14).

The website of the Buzzards Bay Coalition shows a picture of Swartz riding a bicycle near Black Beach in West Falmouth and smiling directly at the camera.  (Defs. Ex. Q; Swartz Dep. at 130; Pl. Reply to Defs. SMF ¶ 54).  Swartz recognized the photo when it was shown to him.  (Swartz Dep. at 130).  He testified that the photo was taken at an event "to help support clean water [and] harbors."  (*Id.*).  He further testified that "he didn't know" that the photo was on the website, but that "this [was not] the type of photograph that [he] would ask the website to

take down because it is against [his] religious beliefs." (*Id.*). When asked "why not," he testified, "this is a beautiful picture of West Falmouth, the creek. This is Black Beach. It's a very beautiful spot." (*Id.*).

There are also several other photographs of Swartz in a fire department uniform—although it does not appear to be a class A uniform—that are displayed in BFD stations. (Defs. Ex. R at 1-2 ("Photos of Swartz"); Pl. Reply to Defs. SMF ¶ 55 (not disputing that these photos are displayed at BFD stations); Swartz Dep. at 135-36 (testifying that he had "probably seen" one of the photos and that it "sure looks like it was hanging somewhere"); *id.* at 137 (testifying that he "may have seen" one of the photos and "it looks like it was hanging somewhere")). He testified that having those "photograph[s] up on the wall [at BFD]" would not be objectionable to his religious beliefs. (Swartz at 134-35, 137).

On May 5, 2015, a local fire blog posted a photo of Swartz on its website. (Photos of Swartz 3; Sylvester Dep. at 146-48 (discussing the blog and photograph)). He is wearing a helmet and appears to be at the scene of an incident. (Photos of Swartz at 3). He is grinning, but not looking directly at the camera. (*Id.* at 3).[9]

Swartz testified that he had worn the class A uniform at funerals, but that he could not recall ever wearing the class A uniform for any other professional purpose, including at parades or when receiving any type of award. (Swartz Dep. at 43-44).

### 7.   Use of the Photographs of Fire Employees in Class A Uniforms

As of October 1, 2019, all fire department employees (except for an employee who had been hired a few weeks earlier) had ID cards and PATs with photographs. Not all of the photographs on the ID cards and PATs are of the employees in their class A uniforms.

---

[9] Swartz also has a driver's license with a photograph on it. (Defs. Ex. S ("Swartz Driver's License")).

(Sylvester Dep. at 1, 43-44, 50, 53).   Sylvester testified that "during [his] time as chief, []the department has [still never] had consistent photographs on ID cards and accountability cards." (*Id.* at 52-53).  However, he testified that that was "[o]nly because we're still – now we had such a huge turnover that we are still going with the Class A, that's coming." (*Id.* at 113).

According to Weeks, around June 2016, the photographs that had been taken of the firefighters in their class A uniforms were displayed on a board at the entrance of headquarters. However, Kimberly Griffin, an administrative assistant for BFD, testified that some of the photographs included firefighters in other dress, including more casual apparel.  (Weeks Dep. at 27; Griffin Dep. at 13, 22; Sylvester Dep. at 21).  In 2017, when the department moved headquarters, the photographs were taken down, and the board has been empty since then. (Weeks Dep. at 28; Defs. Reply to Pl. SMF ¶ 40).  According to Sylvester, implementation of the policy eventually had to be restarted because more than half of the department had turned over or transferred.  (Sylvester Dep. at 50).  In addition, either the department or the photographer lost about one-third of the photographs the professional photographer took.  (*Id.* at 50; *see* Weeks Dep. at 32).  Sylvester testified that he is planning to hang up the photographs in the main lobby area of the station on a bulletin board again at some point.  (*Id.* at 150-52).

**B.    Procedural Background**

Swartz filed this case on December 14, 2018, asserting a claim against Sylvester under 42 U.S.C. § 1983 for violation of his rights under the Free Exercise Clause of the First Amendment. (Dkt. No. 1, Compl.).  On March 14, 2019, he moved for leave to amend his complaint to add a claim against the Town of Bourne and Sylvester pursuant to Mass. Gen. Laws ch. 149, § 148 for failure to pay him certain unused vacation and other accrued time upon his termination from the BFD.  (Dkt. No. 9, Ex. 1, Proposed First Am. Compl.).  On March 27, 2019, the Court granted his motion for leave to amend the complaint.  (Dkt. No. 13).

13

Defendants moved for summary judgment on both counts on November 20, 2020.

## II.     Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must "view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

## III.    Analysis

### A.     Qualified Immunity

Count One alleges a claim against Sylvester under section 1983 for violation of Swartz's rights under the Free Exercise Clause of the First Amendment.  Sylvester has moved for summary judgment on the grounds that (1) Swartz cannot prove a deprivation of his First Amendment rights and (2) qualified immunity.  Because the Court agrees that Sylvester is in fact

14

entitled to qualified immunity, it is only necessary to resolve the second contention.

Section 1983 "creates a private right of action for redressing abridgements or deprivations of federal constitutional rights." *McIntosh v. Antonino*, 71 F.3d 29, 33 (1st Cir. 1995). However, qualified immunity protects public employees "from liability for civil damages"—the type of relief Swartz seeks here—"insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); (*see* Am. Compl. at 4).

The qualified-immunity analysis employs a two-part test: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). For purposes of the second step of that analysis, whether the right was "clearly established" depends on "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right." *Mlodzinski v. Lewis*, 648 F.3d 24, 32-33 (1st Cir. 2011). Although there need not be "a case directly on point, existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Precedents involving "similar facts" help "provide an officer notice" that certain conduct is unlawful. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

The qualified-immunity doctrine "leaves ample room for mistaken judgments." *Berthiaume v. Caron,* 142 F.3d 12, 15 (1st Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 106 (1986)). The question is not whether some right has been clearly established at a highly

15

abstract level, but "whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *McBride v. Taylor*, 924 F.2d 386, 389 (1st Cir. 1991). Thus, officials may enjoy qualified immunity even though their conduct actually abridged a constitutional right. *Berthiaume*, 142 F.3d at 15.

### 1.   Whether the Facts Are Sufficient to Establish a Violation of a Constitutional Right

Swartz alleges that both the order that he sit for the photograph in question and the discipline that he received for refusing to do so violated his rights under the Free Exercise Clause of the First Amendment.

A claim under the Free Exercise Clause can require strict-scrutiny or rational-basis review, depending on "the nature of the . . . challenged government action." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002) (discussing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) and *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)). Specifically, "[a] [policy] that is neutral and of general applicability need not be justified by a compelling governmental interest even if the [policy] has the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531. A policy is not generally applicable, however, "if it is enforced against a category of religiously motivated conduct, but not against a substantial category of conduct that is not religiously motivated and that undermines the purposes of the [policy] to at least the same degree as the covered conduct that is religiously motivated." *McTernan v. City of York*, 564 F.3d 636, 648 (3d Cir. 2009) (internal quotation marks omitted). On the other hand, a policy is not neutral if "the object of [that policy] is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533.

"[T]he minimum requirement of neutrality is that a [policy] not discriminate on its face." *Id.* However, the Free Exercise Clause also "forbids subtle departures from neutrality, and covert suppression of particular religious beliefs"—that is, government hostility that is "masked" rather than "overt." *Id.* at 534 (internal quotation marks and citations omitted). A court must "survey meticulously the totality of the evidence . . . [and] consider the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 163 (2d Cir. 2020).

Here, the parties agree that Sylvester's directive, and the subsequent discipline administered to Swartz, were facially neutral. The issue is therefore whether a reasonable juror could conclude that the "'purpose' of th[e] directive was to coerce [him] into violating his sincere religious principles." (Pl. Opp. at 10).

There is no direct evidence of any kind in the record that Sylvester was hostile towards Swartz's religious beliefs, or toward religious beliefs more generally. However, Swartz contends that there is sufficient circumstantial evidence to establish that Sylvester's motive in issuing the directive and discipline was religious hostility.

Swartz first contends that a reasonable juror could find evidence of such hostility based on the timing of events. He contends that the photograph only became mandatory once he objected to sitting for it, and that prior to that point Sylvester had only requested that employees sit for the photographs. But the undisputed evidence is to the contrary. The communications that were sent before May 2, 2016—the day that Swartz objected—indicate that the photographs were in fact mandatory.

On January 30, Carrara sent an e-mail to all fire department employees that stated that "Emberg has been working to arrange professional photos for *all* department members.  He is now attempting to compile a list of *everyone* in regards to Class A uniforms . . . ."  (January 30 e-mail (emphasis added)).  On March 11, Emberg sent an e-mail stating that "for [those] who already had [class A photos], [they] *must be* retaken again on these dates."  (March 11 e-mail (emphasis added)).  On April 11, Emberg sent an e-mail stating that the photographs would be the next day at noon, and instructed "*[a]ny members* not able to make the[ir] shift [of] class A photo[s] [to] please try to make one of the next three scheduled dates."  (Apr. 11 e-mail (emphasis added)).  The e-mails may not have specifically stated that the photographs were "mandatory," but they use mandatory language, and the only reasonable inference is that all employees were required to have their photograph taken on one of the scheduled dates, and were not free to decline to do so.[10]

In addition, Emberg testified that he "[considered] it to be mandatory to have [the] photos taken" and that his job was "to get all members [of the BFD] to have their Class A photos taken." (Emberg Dep. at 35-37).  He also testified that he considered all of the 2016 e-mails concerning photographs to be mandatory.  (*Id.* at 62).

It is true that there is evidence that Weeks subjectively may not have considered his communication to Swartz on May 2 to be an order.  (Weeks Dep. at 52-53).  Specifically, he stated that he did not consider it an order like those he "ha[s] to give [] at a fire scene" and that the orders "[he] ha[s] to give [] at a fire scene, [] those can't be questioned" and "need to be followed provided people are safe . . . . [but that] [he] fe[lt] that was – the photos coming from

---

[10] An earlier e-mail from Emberg, sent on November 4, 2015, communicates a more optional tone: "Anyone wishing to have a class A photo done.  The photographer will be available Friday.  If interested contact me please for times."  (Pl. Ex. 11 ("November 4, 2015 e-mail")).

me, it wasn't an order from me.  It was what the chief wanted people to do." (*Id.* at 52-53).  He also testified more generally that although "[there] was an understanding that everyone was to have their photo taken," (*id.* at 52), that "it wasn't [his] understanding that it was going to be a requirement for everyone until . . . Swartz [refused]." (*Id.* at 101).  He further testified, however, that he "did not" have an "understanding [on May 2, when he told his reports that their photographs would be taken that day] whether or not the photographs would be required." (*Id.* at 101-02).

In any event, that testimony—which, again, concerns Weeks's subjective understanding—is of limited weight.  It is undisputed that Sylvester assigned Emberg, not Weeks, to be in charge of obtaining the photographs.  (Sylvester Dep. at 56; Pl. SMF ¶ 17 ("Sylvester told Emberg to organize the collection of class A photographs . . . .")).  Indeed, there is no evidence that Sylvester even spoke to Weeks about the photograph directive.  (*See* Weeks Dep. at 99-100 (stating that he never talked to Sylvester about the reasons for the photographs); *id.* at 39 (stating that no one else was involved in the photographs except Emberg and the photographer); *id.* at 37-38 (stating that the request to have the photographs taken came from Emberg)).

There is also no evidence that Sylvester's reasons for the directive were pretextual.  It is undisputed that Sylvester wanted the photographs, at least in part, to "create a public display of department members' pictures" and to distribute to the media on an as-needed basis.  (Pl. Opp. at 10); *Cf. Roman Catholic Diocese of Rockville Center v. Incorporated Village of Old Westbury*, 128 F. Supp. 3d 566, 592 (E.D.N.Y. 2015) ("Plaintiff's argument that the Village enacted the POW Law . . . as retaliation for[] Plaintiff's State Court victory is contradicted by undisputed evidence that the Village was seeking to restructure its zoning scheme . . . as early as 1999, two

years prior to the final State Court decision, and [by] the [other] purpose[s] of the POW Law . . . .").[11]  Plaintiff does not dispute that fact.  (Pl. SMF ¶ 17 ("Sylvester told Emberg to organize the collection of Class A photographs for use on a display board, and for media requests.  Other department members likewise understood that the photographs would be used for the display board, for requests from the media, and promotions.  The public display board of photographs was a tradition that Sylvester wanted to bring to the BFD.") (citations omitted); *see also* Pl. Opp. at 3 ("The public display board of photographs was a new tradition that Sylvester wanted to bring to the BFD."); *id.* at 10 ("As explained above, Sylvester did not originally impose any order; rather, he began collecting photographs of department members in Class A uniforms so that he could create a public display of department members' pictures.")).  And the photographs were in fact publicly displayed on a bulletin board for a period of time, although the implementation of the policy seems to have later lapsed.

It is also undisputed that the directive was generally applicable to all firefighters.  Swartz was told on May 2 that he had to sit for a photograph on May 6 or May 9 or he would be disciplined.  (May 2 e-mail).  That same order applied to everyone at least as of May 5 (and, as noted, likely sooner); that was the date when Emberg e-mailed employees that "[t]he chief has mandated these photos" and that "May 6th and 9th are the last two days to get a Class A photo." (May 5 e-mail).  Swartz contends that it is "critical[]" that Sylvester issued the directive to Swartz "personally" on May 2, and "[waited] three days" to issue the directive to the rest of the department.  (Pl. Opp. at 10).  But no one else had objected to the order when Sylvester told

---

[11] Sylvester testified to multiple motives for the photographs, at least one of which Swartz appears to dispute.  In his reply to defendants' Statement of Material Facts, Swartz disputed defendants' statement that "Sylvester ordered [the] photographs . . . to make the identification cards and accountability tags consistent throughout the BFD."  (*See* Pl. Reply to Defs. SMF ¶ 26).  The photographs in Class A uniforms were never ultimately used on identification cards or PATs.

Swartz that it was mandatory on May 2.  And May 5 was an entirely logical time to remind (or inform) employees that the photographs were mandatory, because the photographer was going to be there next on May 6.  Moreover, Swartz was not disciplined until he failed to sit for photographs on May 6 and on May 9, and it is undisputed that the directive applied to everyone by that time.

In any event, even assuming that the order only became mandatory after Swartz refused to sit for a photograph, that fact alone would not permit an inference that the directive was enacted "because of" his religious beliefs rather than "in spite of" them.  Assuming that the order to take photographs became mandatory on May 2 for Swartz, and on May 5 for the other employees, it is nevertheless undisputed that Sylvester wanted the photographs to "create a public display of department members' pictures" and for media requests.  (Pl. Opp. at 10).  Sylvester clearly intended, based on the e-mails, that "all" employees should sit for a photograph, even if the policy was originally a request and not an order.  (January 30 e-mail).[12]

Swartz also contends that the fact that he was disciplined, and the speed with which he was disciplined, raise an inference that Sylvester imposed the directive and discipline because of his religious beliefs.  He notes that "other firefighters who delayed having their Class A picture taken . . . were not disciplined" and were "freely permit[ted] . . . more time" while Swartz was required to "submit immediately."  (Pl. Opp. at 12).  But it is undisputed that those employees were on vacation or off-duty when the photographer was there, and that they all eventually sat for a photograph.  There is no evidence that any of them objected to doing so.  Moreover, Swartz never asked for more time to sit for the photograph—he did not want to sit for the photograph at

---

[12] It is possible, of course, that Sylvester simply may not have anticipated any objection, and upon receiving one, imposed an order because he realized he would have to do so in order to obtain all of the photographs.

all.  The other employees are therefore not comparably situated to him.  And while he contends

that because he was disciplined eleven days later, when the photographs were still being taken,

there is an "inference of [] discriminatory intent," he has not provided any evidence as to how

swiftly discipline is typically administered under similar circumstances.  (Pl. Opp. at 13).[13]

In summary, the order was both facially neutral (and neutral in light of the totality of the

circumstances) and generally applicable.  Therefore, Sylvester must show only a "rational basis"

for the policy, which requires that it be "rationally related to a legitimate government objective."

*Tenafly*, 309 F.3d at n.24.

As noted, Sylvester contends that he wanted to use the photographs for multiple reasons.

To the extent he says he wanted them for accountability tags and identification cards, that

contention is disputed.  (Pl. Reply to Defs. SMF ¶ 26 (disputing that fact)).

However, it is undisputed that he also wanted to use the photographs, at least in part, for a

public bulletin board and for media requests as needed.  Specifically, he testified that he wanted

to create the bulletin board so that members of the public could identify a firefighter who did a

good job or a bad job, and that he wanted them to send to the media in the case of a death or

other event.  (Emberg Dep. at 14, 35; Sylvester Dep. at 151-52; Pl. Reply to Defs. SMF ¶¶ 30-31

(disputing whether an order that the employees sit for the photographs existed before May 5, but

not disputing that those were the reasons for the bulletin board)).

Publicity of the work of the fire department likely increases trust in the fire department,

which in turn likely improves employee morale.  And promoting the integrity of government

---

[13] Although Swartz does not directly contend that the discipline he received for objecting was disproportionate, and therefore raises an inference of hostility toward his religion, he indicated in his statement of facts that the policy in place at the time reserved "suspension . . . for a repeated infraction or a major offense."  (*See* Pl. SMF ¶ 35; Disciplinary Policy at 1).  It is not clear from the record that that policy was in place at the time of the incident in question, however.  Moreover, there is no evidence in the record to suggest whether disobeying an order is a "major offense" that would therefore require suspension under the policy.  (Disciplinary Policy at 1).

institutions is routinely recognized as a legitimate state interest.  *Cf. Crawford v. Marion County Election Board*, 553 U.S. 181, 191 (2008) (recognizing the "legitimacy" of the "[s]tate's interest in protecting the integrity and reliability of the electoral process").  Moreover, permitting exceptions to the policy would undermine the policy's purpose.  The purpose of the bulletin board was to allow members of the public to come in to identify employees who may have done a good job or a bad job at a fire scene, which would not be possible if only some of the employees had photographs on the board.  And it would be difficult or impossible to predict who might be involved in an event about which the media would be interested in publishing an article.

In summary, the undisputed facts show that Swartz's rights under the Free Exercise Clause were not violated because (1) the order was neutral and generally applicable—whether it was an order before May 2, 2016, or only thereafter; and (2) there was a rational basis for enforcement of the policy.  Accordingly, the first prong of the qualified immunity analysis is satisfied.

**2.**   <u>**Whether the Right in Question Was "Clearly Established"**</u>

**a.**   <u>**Whether the Legal Contours of the Right in Question Were Sufficiently Clear That a Reasonable Official Would Have Understood That What He Was Doing Violated the Right**</u>

In any event, even assuming a violation of Swartz's rights under the Free Exercise Clause, the contours of those rights were not sufficiently clear that a reasonable official would have understood that what he was doing was a violation.

It is clear, of course, that where "the object of a [policy] is to infringe upon or restrict practices because of their religious motivation, the [policy] is not neutral, and [] is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest."  *Lukumi*, 508 U.S. at 533.  However, the relevant question is not whether some right has been clearly

23

established at that highly abstract level, but rather, "whether a reasonable offic[ial], situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Burke v. Town of Walpole*, 405 F.3d 66, 77 (1st Cir. 2005). As the Supreme Court explained in *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019), "while there does not have to be a case directly on point," courts should look for "a case where an offic[ial] acting under similar circumstances was held to have violated the [amendment in question]." *Id.* at 504 (internal quotation marks omitted).

Here, neither party has pointed to a case in which an official acted under similar circumstances—that is, circumstances similar to ordering an employee to sit for a photograph over his religious objection. Swartz nonetheless contends that the principle that "a general proposition of law may clearly establish the violative nature of a defendant's actions, especially when the violation is egregious," applies to this case. *Irish v. Fowler*, 979 F.3d 65, 78 (1st Cir. 2020). But even assuming that Sylvester violated Swartz's rights, the violation is clearly not "egregious." *Id.* Again, there is no direct evidence that Sylvester was overtly hostile toward Swartz's religion or toward religion more generally, or that the order to sit for photographs was selectively enforced.

Therefore, the court must look for "a case where an officer acting under similar circumstances was held to have violated the [amendment in question]." *City of Escondido*, 139 S. Ct. at 504. Again, neither party has pointed to such a case. Some courts have considered whether requiring an individual to sit for a photograph on a driver's license, gun permit, or prison identification card despite a religious objection violated his or her free exercise rights, and concluded that legitimate government interests in safety, among other reasons, provided a rational basis for such laws. *See, e.g.*, *Martin v. Oklahoma*, 2006 WL 8459191, at *2-3 (E. D.

24

Okla. Sept. 15, 2006) (finding that plaintiff had not shown a likelihood of success on the merits of his free exercise claim that the state should have granted him an exception to a law requiring a driver's license to contain a photograph); *Green v. City of Philadelphia*, 2004 WL 1170531, at *8 (E.D. Pa. May 26, 2004) (finding that plaintiff had failed to show that photograph requirement on firearms license was not rationally related to a legitimate state interest); *Zargary v. City of New York*, 607 F. Supp. 2d 609, 613 (S.D.N.Y. 2009) (finding that plaintiff had failed to show that requirement that she take off a head scarf for an identification photograph was not rationally related to a legitimate state interest).[14]  Those cases are not entirely analogous, because the intended uses for the photographs that are undisputed here—that is, to create a bulletin board and for media requests—are not related to safety.  But in all of those cases, the court concluded that there was no violation of the Free Exercise Clause.  And the parties have not pointed to any case involving a more analogous set of facts.  It seems clear, therefore, that Sylvester was not on notice that it would violate Swartz's rights under the Free Exercise Clause to order him to sit for a photograph under the circumstances presented here, and in spite of his religious objection.

Accordingly, even assuming that Swartz's rights under the Free Exercise Clause were in fact violated, the legal contours of those rights were not sufficiently clear that a reasonable official would have understood that what he was doing violated them.

        **b.**      <u>**Whether a Reasonable Official Would Have Understood That His Conduct Violated the Right**</u>

It is also apparent that in the particular factual context of this case, a reasonable officer would not have understood his conduct would violate the right to the free exercise of religion.

---

[14] If the First Circuit has not decided a case involving similar facts to the facts at issue, a right is nevertheless clearly established as long as there is a "a consensus of persuasive authority"—that is, cases in other circuit courts—regarding the circumstances in question.  *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Maldonado v. Fontanes*, 568 F.3d 263, 271 (1st Cir. 2009).

The Supreme Court has acknowledged that "[t]he determination of what is a "religious" belief or practice is more often than not a difficult and delicate task." *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 714 (1981).  Here, the religious belief at issue is highly unusual.  Swartz testified that "[he was not] aware of a particular scripture verse that supports [his] idea that [he] can't have portrait photography taken for self-promotion purposes," (Swartz Dep. at 115-16); that he has "[n]ever read any [] religious literature from the Catholic Church that prohibits portrait photography for personal recognition"; and that he has "[never] heard a Catholic priest, bishop, cardinal, [or] any member of the clergy [] state verbally that portrait photography for personal recognition is objectionable." (*Id.* at 117-18).  In addition, by his own testimony, he was willing to sit for some photographs but not others; he testified that he had no objection to other photographs of him that were displayed at BFD stations, or to a photograph posted on the website of the Buzzards Bay Coalition.  (Swartz Dep. at 130, 135-37).  He has a driver's license, as well as accountability tags and identification cards, with his photographs on them.  (*See, e.g.*, Swartz Driver's License; Pl. SMF ¶ 24 (stating that Swartz had an identification card and PAT with a headshot); Pl. Ex. 15 (Swartz's identification card)).

Of course, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas*, 450 U.S. at 714.  In *Thomas*, the Supreme Court noted that "intrafaith differences . . . are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to Religion Clauses." *Id.* at 715.  However, it is entirely reasonable under the circumstances that an official in Sylvester's position would not have immediately understood what Swartz's religious beliefs involved.

Furthermore, once he learned what those beliefs were, Sylvester acted reasonably under

the circumstances.[15]  According to Swartz, on May 2, Weeks told lieutenants and firefighters under his command that they would have their photographs taken that day.  (Weeks Dep. at 39-40, 53).  Swartz told Weeks that he did not intend to have his photograph taken.  Sylvester overheard that conversation.  (Weeks Dep. at 40-41).  He came over to them, and Swartz asked Sylvester if he could speak to him privately in his office.  (Sylvester Dep. at 96).  During that conversation, he asked Sylvester "[if] the class A photos [] were going to be—if there was something going on with some identification tags or some department identification or incident command or safety."  (Swartz Dep. at 138).  Sylvester responded:  "What if you get promoted and I want to send a picture of you to the newspaper?"  (*Id.*).  Swartz responded that it was against his religious beliefs to take a photograph "for *promotional* purposes" and asked "if it would be okay with him if . . . [he] sent him an e-mail following up on that."  (*Id.* at 139 (emphasis added)).  Sylvester testified that while Swartz was "on the way out" of his office he asked him "[if] he had a driver's license" and he said "yes."  (*Id.* at 99-100; *see also id.* at 80-81).  Sylvester also testified "I'm going to assume, yes" that "Swartz had a department ID in May[] 2016,"  because he also assumed that "all department members had IDs with photographs on them" at that time.  (Sylvester Dep. at 103).

Later that day, Swartz sent an e-mail stating as follows:  "In response to your request for my participation in portrait photography for use *other than accountability*, I request not to participate.  Portrait photography *for personal recognition* goes against my religious beliefs."  (May 2 e-mails (emphasis added)).  Sylvester e-mailed back that Swartz's request not to take the

---

[15] It is undisputed that Swartz and Sylvester had a conversation about the photograph on May 2, although the parties debate the substance of that conversation and who initiated it.  (*See, e.g.*, Defs. Reply to Pl. SMF ¶ 23).  Accordingly, to the extent the conversation is disputed, the Court will assume Swartz's accounts of those events are accurate.

photographs was "respectfully denied" because "[t]hese photos are in fact for use by the Bourne Fire Department as a form of *accountability* and *Department identification* as a member of the Town of Bourne Fire Department." (*Id.* (emphasis added)).

Thus, based on that conversation and those e-mails, Sylvester knew that (1) Swartz would not sit for photographs for "promotional" or "personal recognition" purposes; (2) Swartz's religion permitted him to have a photograph on a driver's license, PAT, or identification card; and (3) Swartz believed that photographs for "accountability" or "identification" were permissible. Under the circumstances, therefore, a reasonable official would have thought that an e-mail clarifying that the photographs were for "accountability" and "department identification" would have established that the taking of the photograph would not violate Swartz's religious beliefs.

In addition, there is no evidence that Sylvester's statement that the photographs would be used for "accountability" and "identification" was made falsely or with an intent to mislead. The undisputed evidence shows that Sylvester intended, among other things, to use the photographs to display on a bulletin board. (Sylvester Dep. at 151-52; Pl. Reply to Defs. SMF ¶ 31 (not disputing that that was the reason for the bulletin board); Pl. SMF ¶ 17 ("Sylvester told Emberg to organize the collection of Class A photographs for use on a display board, and for media requests . . . . The public display board of photographs was a tradition that Sylvester wanted to bring to the BFD")). Sylvester also testified that there was no plan to post the names of the firefighters in the photographs on the bulletin board (and there is no evidence in the record that they were in fact posted when the photographs were eventually displayed). (*Id.* at 151-52). Certainly a photograph appearing in a newspaper because a firefighter received a promotion— which is the use of the photograph that Swartz objected to in Sylvester's office—is more

conventionally "promotional."  But there is no evidence in the record that Swartz's photograph

or any others were ever sent to the media.  His photograph, and others, were only displayed on

the bulletin board.  Thus, it appears that Sylvester never used the photograph in any way that

Swartz had explained to him violated his beliefs.

In summary, there is no genuine dispute that, in the particular factual context of this case,

a reasonable officer would not have understood the conduct violated Swartz's right to free

exercise of religion.   Accordingly, Sylvester is also entitled to qualified immunity on that basis,

and therefore, to summary judgment on Count One.

### B.      Supplemental Jurisdiction

If a "district court has dismissed all claims over which it has original jurisdiction," it

"may decline to exercise supplemental jurisdiction . . . ."  28 U.S.C. § 1367.  "It has consistently

been recognized that [supplemental] jurisdiction is a doctrine of discretion, not of plaintiff's

right."  *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).  "Certainly, if the

federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense,

the state claims should be dismissed as well."  *Id.*

Here, the Court will decline to exercise its supplemental jurisdiction over Count Two,

which alleges a count under Mass. Gen. Laws ch. 149, § 148 against defendants Sylvester and

the Town of Bourne.[16]  Accordingly, Count Two will be dismissed without prejudice.

---

[16] There is at least some question whether the Court has supplemental jurisdiction over Count Two.  *See* 28 U.S.C. § 1367(a); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966) (stating that federal courts have jurisdiction over state-law claims that "derive from a common nucleus of operative fact" as federal claims).

Generally speaking, the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, provides that a worker who has been terminated from employment has a right to be paid in full on the date of his termination.  Mass. Gen. Laws ch. 149, § 148.  Swartz alleges that at the time of his termination "he had accrued but unused paid time off, sick time, and other accrued time" and that "he was not paid his earned and accrued time at the time of his termination."  (Am. Compl. ¶¶ 19-20).

There is at least some doubt as to how that issue (which arose in August 2018) shares a common nucleus of operative fact with the photograph issue (which arose in May 2016).  *See Serrano–Moran v. Grau–Gaztambide*, 195

**IV.** <u>**Conclusion**</u>

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to Swartz's count under 42 U.S.C. § 1983 (Count One).  The Court declines to exercise its supplemental jurisdiction over the remaining count alleged under Mass. Gen. Laws ch. 149, § 148—Count Two—and accordingly that claim is DISMISSED without prejudice.

**So Ordered.**

<u>/s/  F. Dennis Saylor IV</u>
F. Dennis Saylor IV

Dated:  June 28, 2021                                        Chief Judge, United States District Court

---

F.3d 68, 70 (1st Cir. 1999) (affirming a dismissal for lack of supplemental jurisdiction because "[t]he facts and witnesses as to the two sets of claims are essentially different, not common, as the district court found.").